# THE KLEIN LAW FIRM

**ALEXANDER B. KLEIN III**

BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

ALSO LICENSED IN COLORADO

2000 THE LYRIC CENTRE
440 LOUISIANA STREET
HOUSTON, TEXAS 77002
(713) 650-1111
FACSIMILE (713) 227-1121

**MYRIAM K. LEGGE**

OF COUNSEL

FILED IN
14th COURT OF APPEALS
HOUSTON, TX
*03/04/15*
CHRISTOPHER A. PRINE,
CLERK

March 4, 2015

Mr. Christopher A. Prine                                                              *Via eFiling*
Clerk, 14th Court of Appeals
301 Fannin Street, Suite 245
Houston, Texas 77002

> Re: Appellate Cause No. **14-14-00112-CV**; ***Debra C. Gunn, M.D., Obstetrical and Gynecological Associates, P.A., and Obstetrical and Gynecological Associates, P.L.L.C. vs. Andre McCoy, as Permanent Guardian of Shannon Miles McCoy, an Incapacitated Person***; In the Fourteenth Court of Appeals, Houston, Texas

Dear Mr. Prine:

I am writing to provide the McCoy family's response to the post-submission letter brief submitted by Debra C. Gunn, M.D.

## I.     Dr. Brewer's causation testimony is legally sufficient.

The position taken by Dr. Gunn in her letter brief is curious given the fact that she told the jury that she had "no opinions" about the topic of proximate cause[1], or the accuracy of Dr. Brewer's blood loss calculations[2]. Dr. Gunn testified at trial that she not only lacked the "expertise" to testify about the cause of Shannon's code and brain damage,[3] she also told the jury that, if someone wanted to calculate Shannon's blood loss on the 14th, *they needed to ask Dr. Brewer*:

---

[1]  **RR. Vol. 10, 28:4-15.**

[2]  **RR. Vol. 10, 151:7-152:4.**

[3]  **RR. Vol. 10, 123:9-16.**

Q:     Did you do these calculations?

**A:     I didn't do those exact calculations. No, sir, I did not.**

Q:     I see. So if we back up to around 7:27 in the morning where Dr. Brewer had said about 25 percent of the blood volume was lost when her hemoglobin was 5.5. Do you agree or disagree with that number?

**A:     <u>You would have to ask Dr. Brewer</u>.**

**RR. Vol. 9, 277:4-11** (emphasis added).

Despite these concessions, Dr. Gunn's recent correspondence reads more like a pre-trial report from a defense expert explaining her rebuttal points on causation rather than a letter brief on legal sufficiency. Although Dr. Gunn has admitted that she is unqualified to address the issue, her letter brief explores the factual minutiae of Dr. Brewer's testimony in attempt to convince this Court that Dr. Brewer and the jury got it wrong on causation, but her experts got it right. And, as a result, this Court should find that Dr. Brewer's causation testimony amounts to no evidence at all.

Dr. Gunn's argument ignores the fundamental tenet of reviewing a no evidence point on appeal–when causation evidence (e.g., evidence about a disputed fact) falls within the zone of reasonable disagreement, the reviewing appellate court is prohibited from invading the fact finding role of the jury to sustain a no-evidence challenge. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Morrell v. Finke*, 184 S.W.3d 257, 272 (Tex.App.–Fort Worth 2005, pet. denied). Dr. Brewer provided legally sufficient evidence on the issue of proximate cause, and Appellants lost the "battle of the experts" at trial. While Dr. Gunn invites this Court to sit as the thirteenth juror and re-try this case on causation, the invitation to substitute a different decision for the one reached by the jury in this case should be declined.

In a battle of competing experts, the jury has the sole responsibility to determine the credibility of the witnesses and the weight to be given to their testimony. *Morrell v. Finke*, 184 S.W.3d 257, 272 (Tex.App.–Fort Worth 2005, pet. denied). The jury alone gets to decide which expert's testimony on causation should be accepted or rejected in reaching its verdict. *Morrell*, 184 S.W.3d at 272; *Wilson*,

168 S.W.3d at 822. On appeal, when the losing party complains that the expert testimony the jury relied on to reach its verdict is legally insufficient, the reviewing court is not free to re-weigh the evidence, re-try the case, and set aside the jury's verdict. *Morrell*, 184 S.W.3d at 272. This is true even if the reviewing court feels that a different result based on the same evidence is more reasonable. *Morrell*, 184 S.W.3d at 272.

If Texas law really means what it says, e.g., that all evidence in support of the jury's finding on proximate cause must be considered in the light most favorable to the verdict; and, all reasonable inferences to be drawn from the evidence concerning proximate cause, including Dr. Brewer's testimony, must be made in favor of supporting the jury's verdict, the legal sufficiency challenge to Dr. Brewer's testimony should be overruled. *Wilson*, 168 S.W.3d at 821. Nearly twenty-five years ago, this Court made the following observation that provides an enduring backdrop against which Dr. Gunn's legal sufficiency challenge should be viewed:

> Even if we as the reviewing court might view the circumstances of this tragic case contrary to the way the jury did, we cannot become a thirteenth juror and substitute our judgment for theirs. In a battle of competing evidence, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony. ... And it is our obligation to see that the process was fair and carried out according to the rules. We cannot under any circumstances re-try the case.

*Warner v. Hurt,* 834 S.W.2d 404, 408–09 (Tex.App.–Houston [14th Dist.] 1992, no writ); *see also Morrell*, 184 S.W.3d at 272. Here, the jury was free to believe Dr. Brewer's causation testimony over the opinions expressed by the defense experts. The jury was free to accept the McCoy's theory of the case, and to reject Appellants' theory of the case. In cases like this one, where reasonable jurors could resolve conflicting causation evidence either way, a reviewing court must presume they did so in favor of the prevailing party. *Wilson*, 168 S.W.3d at 822. Turning now to the specific points argued by Dr. Gunn, the briefing below shows that her no evidence challenge to Dr. Brewer's testimony should be overruled.

> **II.**    **Dr. Gunn's attempt to establish the incorrectness of Dr. Brewer's blood loss calculations for the jury misses the mark on proximate cause.**

Contrary to Dr. Gunn's contention, the answer to Justice Boyce's question is "yes;" there was evidence presented to the jury showing a mechanism of injury independent of Shannon's blood loss. That mechanism was twofold: (1) Dr. Gunn's negligent failure to order and administer fresh frozen plasma ("FFP") to Shannon on the 14th, and (2) the negligent ordering and administration of Lasix–a diuretic drug that caused Shannon to experience fluid volume loss independent of the blood loss she was experiencing from the DIC. Each of these causation mechanisms is discussed below.

> **A.**    **If Shannon had been administered FFP on the 14th, as required by the standard of care, her blood would have been able to effectively coagulate or clot, stopping the blood loss from the DIC.**

Several undisputed facts are relevant to this aspect of Dr. Brewer's causation testimony. They are as follows:

1.    Shannon was suffering from DIC and actively bleeding at the time Dr. Gunn was caring for her on September 14, 2004.

2.    DIC is a blood clotting disorder that compromises the human body's coagulation mechanism that naturally occurs as a defensive response to bleeding by destroying the clotting factors in the blood.[4]

3.    Shannon's blood was not coagulating on the 14th because the DIC had depleted or destroyed her clotting factors as evidenced by the abnormal

---

[4]  **RR. Vol. 8, 160:8-16, 162:7-13, 163:4-15, 164:1-7** (Dr. Brewer's testimony about how DIC causes the body to consume, not produce, blood clotting factors); **RR. Vol. 13, 219:7-10** (Dr. Alexander, Appellants' maternal fetal medicine expert, testified that DIC causes the destruction of coagulation factors in the blood).

changes in her PT, PTT, FSP, platelet, and fibrinogen lab values on the 14th.[5]

4.    To fix the coagulation problem, fresh frozen plasma or "FFP" is administered to the patient to give the human body what it needs (plasma) to make the coagulation factors that enable the blood to clot and stop the patient's blood loss.[6]

5.    Shannon "needed" FFP on the 14th because it was "vital" to her condition.[7]

6.    When caring for a DIC patient, such as Shannon, the appropriate standard of medical care requires the treating physician to order and administer FFP to the patient so that the patient's blood may coagulate effectively to stop the patient's blood loss from the DIC.[8]

---

[5] **RR. Vol. 12, 230:5-9** (Dr. Aubuchon's testimony); **RR. Vol. 8, 160:8-16, 162:7-13, 163:4-15, 164:1-7** (Dr. Brewer's testimony). Dr. Brewer relied on objective foundational data (the abnormal changes in Shannon's PT, PTT, FSP, and fibrinogen) to explain to the jury how and why Shannon's blood had lost the ability to effectively clot. **Vol. 8, 160:8-16, 162:7-13, 166:11-15, 184:1-21;** *see also* **RR. Vol. 16B, 109-10:McCoy 0273-74 (Plaintiff's Exhibit 7)**. Dr. Brewer explained that Shannon's PT level changed in response to receiving the FFP ordered by Dr. Jacobs; however, it never normalized on the 14th. **RR. Vol. 8, 184:1-21;** *see also* **RR. Vol. 16B, 109-10:McCoy 0273-74 (Plaintiff's Exhibit 7)**. Also, Shannon's FSP and fibrinogen levels remained abnormal on all of the labs drawn on the 14th, further indicating that Shannon's inability to clot was never corrected to normal. **RR. Vol. 16B, 109-10:McCoy 0273-74 (Plaintiff's Exhibit 7)**.

[6] **RR. 164:12-23, 167:16-24** (Dr. Brewer's testimony about how and why FFP is given to a DIC patient to replace clotting factors); **RR. Vol. 9, 257:4-10** (Dr. Gunn testified that FFP is given to the patient to replace the clotting factors that are lost from bleeding); **RR. Vol. 12, 221:12-15** (Dr. Aubuchon testified that plasma contains proteins that cause or promote normal coagulation of the blood); **RR. Vol. 13, 26:15-16** (Dr. Aubuchon testified that plasma is "FFP.").

[7] **RR. Vol. 13, 251:24-253:2** (Dr. Alexander testified that Shannon needed FFP and that it was vital to her condition).

[8] **RR. Vol. 9, 257:4-10, 257:19-24** (Dr. Gunn testified that it was her responsibility to administer FFP to Shannon to replace the clotting factors she had lost due to bleeding).

7. Dr. Gunn was 100% negligent in failing to order or administer any FFP to Shannon on the 14th.

None of these facts have been challenged on appeal. The factual finding Appellants are attempting to re-arrange on appeal (guised in the parlance of a legal sufficiency challenge) is whether Dr. Gunn's negligence in this regard made a difference in terms of preventing Shannon's ultimate outcome. The answer is–of course it did–because the jury had legally sufficient evidence upon which to base this conclusion at trial.

As Dr. Brewer explained to the jury, what Shannon needed to treat her DIC (independent of giving her a massive blood transfusion to replace red blood cells) was a mechanism to make her blood coagulate to stop the blood loss she was experiencing on the 14th.[9] That mechanism, which Dr. Gunn was negligent in failing to provide, was the administration of fresh frozen plasma or "FFP."[10] Independent of replacing Shannon's lost blood volume with packed red blood cells, Shannon's body needed to receive FFP so that her blood could effectively clot to overcome the blood loss caused by the DIC.[11] Dr. Brewer explained as follows:

> **Q: And tell us, is the purpose of the FFP to replace those clotting factors so that you can correct the DIC so the patient stops bleeding?**
>
> **A: That's correct.**

**RR. Vol. 9, 190:17-20** (emphasis added).

---

[9] **RR. Vol. 8, 205:11-206:17, 223:15-225:12, 214:9-215:8, 282:9-15, 282:17-19, 282:25-283:3, 225:1-12, 223:10-12** (Dr. Brewer's direct exam); **RR. Vol. 9, 190:5-20** (Dr. Brewer's re-direct exam); *see also* **RR. Vol. 9, 257:4-10**, **257:19-24** (Dr. Gunn's testimony that Shannon needed FFP and it was her responsibility to give it to her); **RR. Vol. 13, 251:24-253:2** (Dr. Alexander testified that Shannon needed FFP and that it was vital to her condition).

[10] *Id.* at Footnote 9.

[11] *See* Footnote 9.

Q:      Assume with me hypothetically that the defendant wants to come in here and say no, I verbally ordered FFP, we don't see any evidence of that in the nursing notes or the blood bank records or the administration records, do we?

A:      **No, we don't and in addition to that, actually there was a lot of stuff being done. And it was all documented, A, B, C, D, E, F. <u>And the FFP was the only thing that was missing</u>.**

Q:      And was FFP, an actual order for FFP that Shannon get the FFP, critical that morning?

A:      **It was critical that morning.**

**RR. Vol. 9, 190:5-16** (emphasis added).

Q:      In your opinion, was it critical that Shannon receive the FFP?

A:      **<u>Absolutely critical.  Because you can replace blood until the cows come home, but if you can't clot and you have an open wound like inside the uterus, they're going to continue to bleed.[12]  And so you basically put the blood in and the blood comes out, and without clotting factors, you cannot control the coagulation disorder.</u>**

Q:      Did it represent a breach in the standard of care to fail to order the FFP?

A:      **I believe it did.**

Q:      Did Shannon need the FFP?

A:      **She absolutely needed it.**

---

[12]  Dr. Brewer explained that when the placenta separates away from the wall of the uterus, it leaves a big area that bleeds like a big scab, and the patient's clotting factors have to be replaced so that this area can clot properly.  **RR. Vol. 8, 223:15-225:12.**

Q:    Did Shannon continue to lose blood volume because she didn't get the FFP?

A:    **At least partially because she didn't get the FFP.**

**RR. Vol. 8, 205:11 - 206:17** (emphasis added).

Q:    When you looked at the infusion records[,] blood bank records[,] and nursing records, was there any FFP infusing around 10:00 o'clock in the morning ...[?]

A:    **There was not.**

Q:    They were never ordered were they?

A:    **They couldn't have been ordered or the blood bank would have released them.**

Q:    According to the medical record, the last unit of FFP was infused around 3:51 in the morning, and that was the unit ordered –essentially, ordered by Dr. Jacobs, correct?

A:    **That's my understanding.**

Q:    Now, is there any way to defend Dr. Gunn's management of Shannon with a complete absence of FFP, fresh frozen plasma, between the time she came on board and the time she took Shannon to the operating room?

A:    **There is no defense of that in my opinion.**

Q:    Was FFP absolutely critical to taking care of this lady?

A:    **It was absolutely critical.**

**RR. Vol. 8, 214:9 - 215:8.**

Dr. Brewer also testified that, if Shannon had been properly resuscitated with FFP, blood, and platelets, Shannon's outcome would have been completely different:

A:    **If she had been adequately resuscitated [with blood, platelets and FFP] and she had bled the amount that she bled from 11:00 o'clock to 2:00 o'clock and had been taken to the operating room, I believe with reasonable certainty that they would have put her to sleep, intubated her, taken her uterus out, and she would have woken up intact, except missing her uterus.**

**RR. Vol. 8, 282:9-15** (emphasis added).

A:    **As you look through where all this blood loss occurred, it was all cumulative. And I think I've stated several times that she didn't get enough clotting factors. You can pore the blood in, but the blood just keeps coming out if you can't clot it.**

**RR. Vol. 8, 282:17-19, 282:25-283:3** (emphasis added).

Q:    What does that mean: Fundus is boggy and that when they massaged it, there was a large amount of bleeding?

A:    **So the way I read this is, it's kind of what I was describing earlier, if you don't -- if you don't replace the clotting factors, you put blood in and blood comes out because she had a raw bed where the placenta was detached.**

**RR. Vol. 8, 223:10-22** (emphasis added).

Q:    When it got to the point that the uterus began to become unable to contract back down, is it foreseeable to get even more bleeding when you've got uncontrolled DIC?

A:    **That's correct exactly what happens.**

Q:      Is that exactly the position the defendant put herself in by not taking the right steps throughout the earlier part of the day?

**A:      I think not replacing the clotting factors has a lot to do with the uterine atony.**

Q:      That means not getting the FFP?

**A:      That's right.**

**RR. Vol. 8, 225:1-12** (emphasis added).

Dr. Brewer's causation testimony sufficiently established that the negligent failure to provide Shannon with FFP was a substantial factor in bringing about her brain damage and without this negligence Shannon's brain damage would not have occurred. **RR. Vol. 8, 205:11-206:17, 223:15-225:12, 214:9-215:8, 282:9-15, 282:17-19, 282:25-283:3, 225:1-12, 223:10-12**; **RR. Vol. 9, 190:5-20.**

Dr. Brewer established that, if Dr. Gunn had actually ordered and administered the 4 units of FFP to Shannon that she claimed to have verbally ordered on the 14th, it would have made a difference in preventing Shannon's brain damage because, in reasonable medical probability, the FFP administration would have enabled Shannon's blood to coagulate and stop the blood loss she had experienced before 1:00 p.m. on the 14th. *Id*. Shannon never got the FFP that she needed to make her blood clot effectively because Dr. Gunn never ordered it. According to Dr. Brewer, this negligence in failing to order and administer the FFP proximately caused Shannon's brain damage because Shannon continued to bleed (because her blood couldn't coagulate), resulting in her ultimate cardiovascular de-compensation into hemorrhagic shock, cardiac arrest and brain damage:

1.      Dr. Brewer testified that Shannon's lack of blood, lack of circulating blood volume, proximately caused her brain damage because she didn't have adequate blood flow and oxygen delivery to her brain. **RR. 8:258:16-25; RR. 8:261:9-17**.

2.     Dr. Brewer testified that it was Dr. Gunn's responsibility to keep this from happening by ordering the administration of more blood and blood products, especially FFP, to keep this from happening. **RR. 8:261:18-22.**

3.     Dr. Brewer testified that, given Shannon's profound blood loss, it was foreseeable that Shannon would go into V-fib. **RR. 8:248:14-19; RR. 8:245:1-5; 8:259:8-23.**

4.     Dr. Brewer testified that, as a result of the V-fib, Shannon's heart was not beating properly, resulting in inadequate blood flow and oxygen to her brain. **RR. 8:247:12-248:4**.

5.     Dr. Brewer testified that, when Shannon went into V-fib, she was down for about 11 minutes; and, during CPR, she was down for an additional 20 minutes. **RR. 8:248:4-13**.

6.     Dr. Brewer testified that the V-fib was basically a cardiac arrest because Shannon's heart stopped pumping properly. **RR. 8:252:7-10**.

7.     Dr. Brewer testified that the V-fib resulted in lack of oxygen to Shannon's brain. **RR. 8:256:8-12.**

8.     Dr. Brewer testified that Shannon's lack of blood, lack of circulating blood volume caused her heart to go into V-fib. **RR. 8:258:24-259:1**.

9.     The arterial blood gases taken from Shannon after she went into V-fib showed metabolic acidosis, e.g. a pH of 6.9 (7.35-7.40 normal) , a base excess of -24. **RR. 8:252:13-253:14**.

10.     Shannon's blood gases were consistent with someone who has suffered global brain damage from oxygen deprivation; and, that the EEG study was consistent with this analysis. **8:259:24-260:2.**

11.     The evidence of metabolic/lactic acidosis proves that all of Shannon's tissues, including her brain, were extremely low in oxygen. **RR 8:254:16-19**.

12.     Dr. Brewer testified that, in reasonable medical probability, if Shannon's DIC had been correctly (non-negligently) treated by Dr. Gunn, Shannon's brain damage would not have occurred. **RR. 8:250:13-18.**

13.     Dr. Brewer testified that her opinion concerning the cause of Shannon's brain damage was medically superior to the other possible causes that she excluded. **RR. 8:279:18-280:5**.

Dr. Brewer also testified that her causation analysis was confirmed by the following medical evidence regarding the etiology of Shannon's brain damage:

1.      Dr. Brewer testified that the neurological assessment of Shannon performed by the treating neurologist at Women's Hospital confirmed her causation analysis; and, Dr. Brewer described her causation opinions in the context of the causation diagram the treating neurologist included in Shannon's medical records **(RR 8:261:23-262:15; RR. 8:263:6-20**; **Plaintiffs' Exhibit 5**);

2.      Dr. Brewer testified that her causation analysis was consistent with and confirmed by the seventeen (17) neurology consults from St. Luke's Hospital (the hospital where Shannon was taken to treat her brain injury) all of which agreed that Shannon suffered permanent brain damage from lack of blood flow and oxygen to the brain (**RR. 8:263:21-264:16; Plaintiffs' Exhibit 8A-8Q**);

3.      Dr. Brewer testified that her causation analysis was confirmed by Shannon's abnormal EEG results that showed evidence of anoxic brain injury (**RR 8:257:19-25**);

4.      Dr. Brewer testified that her causation analysis was confirmed by Shannon's arterial blood gas results, showing evidence of profound

metabolic acidosis consistent with oxygen deprivation from blood loss (**RR 8:254:16-19**); and,

5.      Dr. Brewer testified that her causation analysis was confirmed by the radiology report discussing the head CT results at St. Luke's Hospital, showing radiological evidence that Shannon had suffered severe ischemic brain damage (**RR. 8:266:20-23**).

Dr. Brewer also testified that her causation analysis was confirmed by ruling out or excluding other plausible causes for Shannon's brain damage:

1.      Dr. Brewer testified about how and why the CT of the head and neurology reports from St. Luke's Hospital ruled out intracranial bleeding and CVA or stroke as a possible cause for Shannon's brain damage (**RR. 8:266:13-16**); (**RR. 8:270:19-271:22**);

2.      Dr. Brewer testified about how and why she ruled out a pulmonary embolism as a possible cause for Shannon's brain damage (**RR. 8:271:15-272:2**);

3.      Dr. Brewer testified about how and why she ruled out amniotic fluid embolism as a possible cause for Shannon's brain damage (**RR. 8:272:7-19**);

4.      Dr. Brewer testified about how and why she ruled out infection as a possible cause for Shannon's brain damage (**RR. 8:272:20-273:7**); and,

5.      Dr. Brewer testified about how and why she ruled out Dr. Alexander's uterine atony theory (**RR. 8:281:21-283:5**), and Dr. Steiner's micro-thrombi theory as possible causes for Shannon's brain damage. **RR. 8:284:14-292:14**.

In this case, Shannon's blood clotting system was deactivated by the DIC and not working anymore. **RR. Vol. 8, 163:4-15, 164:1-7**. To fix this problem, Dr. Brewer testified that Shannon needed to receive FFP so that the clotting factors and cells that enable the blood to coagulate could be replaced, preventing further blood

loss and permanent injury to Shannon.  **RR. Vol. 8, 164:12-23, 167:16-24, 205:11-206:17, 223:15-225:12, 214:9-215:8, 282:9-15, 282:17-19, 282:25-283:3, 225:1-12, 223:10-12**; **RR. Vol. 9, 190:5-20.**

The fact that Shannon needed FFP to enable her blood to clot was neither contested at trial, nor on appeal.  In fact, Dr. Alexander testified that FFP was "vital" for Shannon and that she "needed" it on the 14th.  **RR. Vol. 13, 251:24-253:2**.  Dr. Gunn testified that Shannon needed FFP and it was her responsibility to give it to her on the 14th.  **RR. Vol. 9, 257:4-10**, **257:19-24**.  As Dr. Gunn pointed out, Shannon's complete inability to coagulate prevented her from receiving an epidural because, if she bled in the small space around her spinal cord from the insertion of the epidural needle, should could become paralyzed.  **RR. Vol. 10, 69:6-16**.  These facts are also undisputed on appeal.

While the issue of whether Dr. Gunn ever made a "verbal" or "telephone" order for FFP was disputed at trial, the jury resolved the conflicting evidence on this issue in favor of Shannon, finding Dr. Gunn negligent, in part, for failing to order and administer FFP.  The jury also found that Dr. Gunn's negligence in this regard proximately caused Shannon's permanent brain damage.   Through the above-referenced testimony of Dr. Brewer, along with the causation findings documented by the treating neurologists in Shannon's medical records, the jury was provided with more than a scintilla of evidence to establish that Dr. Gunn's negligent failure to order and administer FFP to Shannon proximately caused her brain damage.

Dr. Brewer explained to the jury that the administration of FFP would have, in reasonable medical probability, made a critical difference in enabling Shannon's blood to coagulate effectively thereby stemming and stopping the blood loss and preventing Shannon's brain damage.  The testimony by Dr. Brewer was based on reliable foundational data and medical science, not *ipse dixit* conclusions or unfounded assumptions.

Dr. Brewer established for the jury that Shannon needed to receive FFP to make her blood clot and to overcome the DIC.  Shannon didn't receive any FFP on September 14, 2004 because Dr. Gunn never ordered it, negligently violating the standard of care in this case.  This negligence was a substantial factor in bringing about Shannon's brain damage in this case because, in the absence of the FFP,

Shannon's blood was unable to coagulate, resulting in Shannon's continued blood loss followed by hemodynamic instability, cardiovascular collapse, hypovolemic shock, cardiac arrest, and hypoxic encephalopathy. At least that's what the jury concluded after hearing all the evidence presented by both sides, including Dr. Brewer's testimony and the causation findings documented in the medical records by Shannon's treating neurologists.

Think about it this way, if the complete failure to administer FFP to Shannon on the 14th was not a proximate cause of Shannon's brain damage, why did Appellants so ferociously attempt to establish (but couldn't) that the treating nurses were allegedly responsible for failing to follow Dr. Gunn's alleged "telephone order" for 4 units of FFP on the 14th?[13] Appellants' no evidence/legal sufficiency point on causation should be overruled.

**B.** **The negligent ordering and administration of Lasix caused Shannon to experience fluid volume loss independent of the blood loss she was experiencing from the DIC.**

Lasix is a diuretic drug that causes the patient to urinate. Urination, in turn, results in fluid loss from the body. Dr. Brewer testified that Lasix was contraindicated for Shannon because she was bleeding, and that the Lasix administration made Shannon's condition "worse." **RR. Vol. 8, 218:1-220:2, RR. Vol. 8,220:18-22, RR. Vol. 8,220:23-222:12, RR. Vol. 8, 270:11-16.** Contrary to Dr. Gunn's assertion in her letter brief, Dr. Brewer testified that Dr. Gunn was negligent in giving Shannon Lasix, and that this negligence was a proximate cause of Shannon's brain damage. **RR. Vol. 8, 218:1-220:2, RR. Vol. 8,220:18-22, RR. Vol. 8,220:23-222:12, RR. Vol. 8, 270:11-16.**

---

[13] The evidence showed (which the jury believed) that Dr. Gunn never wrote any orders for FFP on the 14th. **RR. Vol. 8, 214:9 - 215:8.** (Dr. Brewer's testimony); **RR. Vol. 9, 259:16-21, 261:11-13, 261:14-19** (Dr. Gunn's testimony); **RR. Vol. 13, 253:5-8** (Dr. Alexander's testimony). While Dr. Gunn claimed to have issued a telephone order for FFP, there was no documentation in any of Shannon's medical records of any written order or telephone order being made by Dr. Gunn for fresh frozen plasma. Indeed, the hospital blood bank employee, Ms. Fowler, testified that she thawed out 2 units of FFP on her own to be "proactive;" however, she did not have any documentation to prove that the FFP had been ordered by Dr. Gunn. **RR. Vol. 14, 93:8-94:16, 97:2-6, 105:18-19.**

So why is it that the treating physician shouldn't do what Dr. Gunn did with respect to the Lasix administration in a patient situated like Shannon? Dr. Collins, Shannon's treating cardiologist, perhaps said it best:

Q: Our bodies, yours, mine, and Shannon's, all have a built in physiologic response to bleeding; isn't that right?

**A: Yes.**

Q: And when we begin to bleed and our body senses that we're losing our volume of fluids, our body compensates by stopping the urine production, correct?

**A: Yes.**

Q: Because our body wants to save its fluids and doesn't want to unnecessarily expel any in the form of urine, correct?

**A: Yes.**

**RR. Vol. 14, 65:25-66:11.**

Q: So when you have these patients who have DIC and are bleeding, what the doctors are trying to do and the nurses are trying to do is to increase their volume with blood, blood products and IV's, correct?

**A: Yes.**

Q: Sure. When you have a patient that is bleeding from, for example DIC, what you see is the patient's body tries to compensate for that loss of fluid volume by either halting the production of urine or cutting it back significantly, correct?

**A: Yes.**

**RR. Vol. 14, 65:14-24.**

Q:     Did you ever order Lasix for Shannon?

A:     **No, sir.**

Q:     You understand how Lasix works, correct?

A:     **Yes.**

Q:     Would you want to give Lasix to a patient situated like Shannon who was bleeding with DIC?

A:     **I wouldn't have given it.**

Q:     Why is it that you would not have given Lasix to a patient like Shannon who had DIC and was bleeding?

A:     **Well, it wouldn't do any good.**

**RR. Vol. 14, 64:16-25.**

Dr. Collins' testimony corroborated what Dr. Brewer had explained to the jury in her testimony, e.g., the Lasix administration wouldn't do any good because it would cause Shannon to urinate, compounding the blood loss problem by further depleting her fluid volume and making Shannon's condition "worse":

Q:     At 10:15, what information did the nurses reveal about Shannon's condition?

A:     **At 10:15, they said that -- there was a report of a decrease in urine output.**

Q:     Now, what does that tell someone who knows what they're doing who is managing a patient like Shannon?

A:     **Part of what urine output tells you in, especially in a young, healthy patient, is it tells you how well her kidneys are being profused. And**

**that's kind of a fancy way of just basically saying: Is there blood flow to the kidneys? Are they getting enough? Because what happens is the blood goes through the kidneys and gets filtered out, and it produces urine as a result of that. So if your urine output is down, is decreased, that means that your blood flow to the kidney, particularly in this kind of situation, is probably decreased. So it's really an important thing to be followed.**

Q:     Is it a warning sign?

A:     **It absolutely is a warning sign, particularly in the context of this patient.**

**RR. Vol. 8,218:2-25.**

Q:     How did the defendant respond to this warning sign?

A:     **She gave her drug called Lasix. And Lasix is a diuretic which means it makes you urinate more.**

Q:     Is that the right thing to do?

A:     **Not in the scenario where her volume was down so far. We use Lasix for fluid overload; in other words, too much fluid, we need to get rid of some water. We use Lasix for people with congestive heart failure, where there is too much fluid in their heart. In the context of bleeding, it's contraindicated.**

Q:     Did ordering the Lasix make it worse for Shannon?

A:     **Probably.**

Q:     Was the Lasix exactly what you didn't want to order?

A:     **It was one of the things you didn't want to order.**

Q: What did it tell you about the defendant's understanding of what she was doing when she ordered Lasix around 10:15 in the morning when the nurses told her the urinary output was down?

A: **Well, the way I looked at that is she didn't really understand what was happening to the patient.**

**RR. Vol. 8,219:1-220:2.**

Q: Was it negligent of the defendant to order Lasix that morning, failing to act reasonably and prudent?

A: **It was failing to act reasonably and prudently, yes.**

**RR. Vol. 8,220:18-22.**

Q: Now, at around 10:50 in the morning, what, in fact, was related to the defendant from the nurses?

A: **10:50 phone report: Urinary output of 35 in 1 the last hour. That was after Lasix. And how I interpret that is if she had had too much fluid, she would have made a lot of urine. But it says to me that, in fact, she was fluid low; in other words, she didn't have enough fluid in her veins to actually increase her urine output.**

Q: Let's back up. There is this dose of Lasix given that is supposed to cause someone to make a lot of urine, correct? Yet, after the dose was given, the nurses called up and reported that there was only, what?

A: **35 Mls.**

Q: 35 MLs. That's?

A: **It's like that.**

Q:     A third of a cup?

A:     **(The witness nods.)**

Q:     What should that tell a physician who knows what they're doing when they give a dosage of Lasix like that and get a third of Dixie cup of urine afterward?

A:     **I think it tells a reasonable physician that that's not the appropriate treatment, that that's not going to fix the problem.**

Q:     But what did the defendant do in response to that?

A:     **Eventually, she gave her a second dose.**

Q:     Was it negligent to give the second dose of Lasix; that is, failing to act reasonably and prudently?

A:     **I believe it was.**

Q:     Is that the opposite of what Shannon needed?

A:     **That is the opposite of what Shannon needed.**

Q:     Is there anyway to defend giving these two doses of Lasix?

A:     **I think the only defense of that is she didn't understand what was going, what was happening with the patient.**

**RR. Vol. 8,220:23-222:12.**

After being provided with the definition of proximate cause, Dr. Brewer testified that the negligence of Dr. Gunn, including the Lasix administration, proximately caused Shannon's brain damage:

Q:     And was the negligence of these things we've outlined, was that a proximate cause of what we see here?

**A:     I believe it is.**

Q:     Or the proximate cause?

**A:     It is the proximate cause, yes.**

**RR. Vol. 8, 270:11-16.**

In sum, Dr. Brewer's testimony concerning the negligent Lasix administration and how the administration of a diuretic to a bleeding patient making a third of a Dixie cup of urine was causally linked to Shannon's brain damage in this case was legally sufficient. Appellants' no evidence/legal sufficiency point on causation should be overruled.

**III.    The letter brief points raised by Dr. Gunn do not establish that Dr. Brewer's causation testimony was legally insufficient.**

**A.     The blood loss "re-calculations" performed by Dr. Gunn in her letter brief do not prove that Dr. Brewer's causation testimony was legally insufficient.**

The fallacy of Dr. Gunn's attack on Dr. Brewer's blood loss analysis by attempting to re-calculate it on appeal is that Dr. Gunn told the jury that, if someone wanted to calculate Shannon's blood loss on the 14th, *they needed to ask Dr. Brewer*, not her. **RR. Vol. 9, 277:4-11**. Dr. Gunn told the jury that she had no basis to dispute the blood loss calculations performed by Dr. Brewer; and, that, even though she sat in the courtroom and watched Dr. Brewer calculate Shannon's blood loss for the jury, she never went back to re-calculate them:

Q:     Do you agree or disagree with Dr. Brewer that around 8:00 o'clock in the morning that Shannon had lost 25 percent of her blood volume, or you just don't have an opinion?

A:    **I don't have an opinion.**

Q:    When it comes to the hemoglobin that came back at 7.5, I believe, that afternoon, Dr. Brewer made the adjustments and calculations and said at that point Shannon was down 22 percent in her blood volume. Do you agree with that, disagree or just not have an opinion?

A:    **I don't have an opinion.**

Q:    And then at around 1:00 o'clock -- excuse me. I misspoke about the hemoglobin. This came back at 1:00 o'clock, but she did the calculations of input and output and around 11:00, she said 22 percent?

A:    **No opinion.**

Q:    So then around a little after 1:00 o'clock, we see a hemoglobin of 7.5, but when you allow for the bleeding and what was replaced, Dr. Brewer said 33 to 44 percent of Shannon's blood volume was gone. Do you agree with those calculations, disagree with them, or do you just not have an opinion?

A:    **I don't have an opinion.**

Q:    Do you believe that if you're going to undertake the serious job of managing a patient that you know has DIC that part of your job is to perform calculations to know where she is in terms of her blood volume?

A:    **Yes.**

Q:    Yet, when we look at this chart, we don't see any calculations whatsoever, do we?

>    A:    **My calculations were not part of the medical chart, no.**[14]

**RR. Vol. 10:151:7-152:13.**

>    Q:    And have you redone those calculations to give us opinions as to where you thought Shannon was at 8:00 o'clock in the morning or 11:00 in the morning or 1:00 in the afternoon?

>    A:    **I've not redone those calculations, no.**

**RR. Vol. 10:152:14-18.**[15]

How can Appellants credibly argue on appeal that Dr. Brewer's blood loss calculations are *ipse dixit* conclusions with no factual basis whatsoever, when Dr. Gunn herself didn't disagree with them at trial, didn't re-calculate them for the jury to demonstrate their alleged inaccuracy, and told the jury that, if they wanted to know how much blood Shannon lost, they needed to ask Dr. Brewer? Dr. Aubuchon, the defense transfusion medicine expert, never disputed the blood loss calculations performed for the jury by Dr. Brewer. **RR. Vol. 12, 53:3-5**. Neither did Dr. Alexander, the defense maternal fetal medicine expert. **RR. Vol. 13, 240:4-10**. On cross-examination, Dr. Brewer offered to re-calculate the blood loss for defense counsel by going back through the input and output records ("I's and O's"), but defense counsel refused. **RR. Vol. 9, 219:9-12**. So, at the end of the day, the jury was left with the uncontested evidence provided by Dr. Brewer about Shannon's blood loss. Dr. Gunn's letter brief on this issue should be overruled.

---

[14] Dr. Gunn testified that she performed blood loss calculations similar those which Dr. Brewer performed in front of the jury at the time she was caring for Shannon, but she never produced them, or made them a part of the medical records. **RR. Vol. 9, 277:13-18; Vol. 10, 34:16-24**.

[15] Neither Dr. Aubuchon, nor Dr. Alexander, disputed the blood loss calculations performed for the jury by Dr. Brewer. **RR. Vol. 12, 53:3-5; RR. Vol. 13, 240:4-10**.

**B.** **Dr. Brewer's blood loss calculations were supported by the reliable foundational data contained in Shannon's medical records.**

The point of the blood loss analysis performed by Dr. Brewer was to show the jury that Dr. Gunn had plenty of warning signs to tell her what was going on with Shannon and that she needed to <u>stop</u> Shannon's bleeding by doing something different with respect to her treatment of Shannon, including giving Shannon FFP to enable her blood to clot effectively and to <u>not</u> make her fluid volume loss and hypovolemia[16] worse by administering a diuretic. While Dr. Gunn alleges on appeal that Dr. Brewer's blood loss calculations are "unsupported estimates," the reality of what Dr. Brewer did to establish this point for the jury is anchored in the reliable, objective foundational data contained in the medical records.

This data included Shannon's total blood volume on admission,[17] changes in Shannon's lab values[18] (e.g., her hemoglobin, hematocrit, platelet, PT, PTT, FSP, and fibrinogen levels), Shannon's vital signs (e.g., age, weight, pregnancy status, heart rate, breathing rate, and blood pressure), Shannon's fluid intake (e.g., IV fluids, red blood cells, and platelets), and Shannon's fluid output (e.g., blood loss and urinary output). **RR. Vol. 8 8:187:22-191:3, 191:20-192:10, 193:7-194:8, 198:11-199:3, 199:11-200:22, 201:4-7, 203:13-25, 210:18-213:1, 213:4-18, 218:2-220:2, 220:23-222:12, 248:20-249:6; RR. Vol. 9, 196:14-25, RR. Vol. 9, 197:1-17, RR. Vol. 9, 207:7-208:15; see also RR. Vol. 16B 109-111:McCoy 0273-275 (Plaintiffs' Exhibit 7).**

Dr. Brewer calculated that Shannon's total blood volume was approximately 6.7 liters of blood (18 units) when she arrived at the hospital. **RR. Vol. 8, 187:4-21; RR. Vol. 9, 197:13-17, 207:7-208:15.** Appellants never disputed this testimony at trial. Dr. Brewer testified that, according to the changes in Shannon's lab results concerning her hemoglobin, platelet, FSP, and fibrinogen levels, as well as the fluid input and output data contained medical records, Shannon lost approximately 1,400

---

[16] Dr. Gunn testified that the term "hypovolemia" means that the patient's "circulatory system did not have enough fluid and blood to support bodily functions." **RR. Vol. 10, 92:12-17**.

[17] **RR. Vol. 9, 197:13-17, 207:7-208:15**.

[18] **RR. Vol. 9, 196:14-25.**

mL of blood (1.4 liters/4-5 units) before the delivery of her daughter. **RR. Vol. 9, 196:14-25**. Dr. Brewer testified that, according to this same foundational data, Shannon lost another 1,600 mL of blood in the ICU, totaling approximately 3,000 mL of blood loss. **RR. Vol. 9, 197:1-12**. Dr. Brewer's testimony about Shannon's blood loss was based on Shannon's total estimated blood volume, the changes in Shannon's lab values, as well as the information concerning Shannon's fluid input and output documented in the medical records. **RR. Vol. 8 8:187:22-191:3, 191:20-192:10, 193:7-194:8, 198:11-199:3, 199:11-200:22, 201:4-7, 203:13-25, 210:18-213:1, 213:4-18, 218:2-220:2, 220:23-222:12, 248:20-249:6; RR. Vol. 9, 196:14-25, RR. Vol. 9, 197:1-17, RR. Vol. 9, 207:7-208:15; see also RR. Vol. 16B 109-111:McCoy 0273-275 (Plaintiffs' Exhibit 7).**

All of this data was analyzed and synthesized for the jury by Dr. Brewer to provide them with an understanding about how and why Shannon was bleeding, how much blood Shannon had lost and was continuing to loose before 1:00 p.m. (despite being transfused with blood and platelets), what Shannon's body was doing physiologically to compensate for the blood loss (e.g., increased heart rate, increased breathing rate, drop in urine output, drop in blood pressure), and why Shannon needed to receive FFP to stop her blood loss and prevent the monumental disaster that Dr. Gunn caused by her own negligence. *Id.*

The medical records show that Shannon was administered 3,400 mL of blood and blood products in the operating room (15 units of packed red blood cells, 16 units of FFP, and 8 units of platelets) to replace the clotting factors and blood volume that Dr. Gunn negligently allowed Shannon to lose on the 14th. **RR. 16A, 131:McCoy 0121, 137:McCoy 0127 (Plaintiff's Exhibit 7)**. If Dr. Brewer's blood loss calculations for the jury were really "unsupported estimates," why is it that her estimation of Shannon's blood loss before 2:10 p.m. on the 14th (3,000 mL) is so close to the documented amount of blood volume replaced in the operating room (3,400 mL)? **RR. 16A, 131:McCoy 0121, 137:McCoy 0127 (Plaintiff's Exhibit 7)**. Dr. Brewer's blood loss calculations were supported by the reliable foundational data contained in Shannon's medical records, and this letter brief point should be overruled.

C.    **Dr. Gunn's argument about the relationship between Shannon's bleeding and uterine atony is supported by the medical records.**

Dr. Brewer testified that Shannon's uterine atony had to be analyzed in context. **RR. Vol. 8, 281:21-283:5**.  Dr. Brewer testified that the uterine atony was a by-product of the massive blood loss Shannon experienced prior to 1:00 p.m. on the 14th. **RR. Vol. 8, 281:21-283:5**.  Dr. Brewer testified that, if Shannon had been adequately resuscitated, but experienced the same amount of bleeding she did between 1:00 p.m. to 2:00 p.m. on the 14th, she would have come out of the surgery "intact," indicating that uterine atony was not the cause of Shannon's brain damage.  **RR. Vol. 8, 281:21-283:5**.  Dr. Brewer also testified that her opinions regarding Shannon's uterine atony were based, in part, on her experience as qualified expert in caring for these patients, as well as the evidence concerning Shannon's enormous blood loss prior to 1:00 p.m.; and, the fact that none of Shannon's clotting factors were replaced through the administration of FFP.  **RR. Vol. 8, 249:11-250:25, 225:6-12, 281:21-283:5**.  Dr. Brewer's testimony concerning the exclusion of uterine atony as a possible cause for Shannon's outcome was supported by the reliable foundational data contained in Shannon's medical records.  This letter brief point should be overruled.

D.    **Dr. Brewer's testimony about Shannon's internal bleeding was based on the evidence contained in the medical records.**

While Dr. Brewer said that Shannon had blood "pouring out," she never said that all of Shannon's blood loss came out of her vagina.  **RR. Vol. 8, 249:2-6**.  Dr. Brewer testified that Shannon had visible blood loss from the vagina[19], as well as internal bleeding into the wall of the uterus.  **RR. Vol. 8, 223:10-224:18, 225:1-20**.  This testimony is based on the documented findings contained in the medical records.

---

[19]  Dr. Brewer testified that, according to the medical records, Shannon had a large amount of bleeding at 12:00 p.m. on the 14th, and expelled a large amount of blood from the vagina at 12:45 p.m. on the 14th.  **RR. Vol. 8, 223:10-14, 229:2-6**.  According to Dr. Gunn's discharge summary, Shannon had approximately 800 to 1,000 cc's of blood and clots at the perineum at 1:28 p.m.  **RR. Vol. 16A, 42:McCoy 0032 (Plaintiff's Exhibit 7)**.  The intensive medicine physician called by Dr. Gunn, Nancy J. Esper, M.D., documented in her note that Shannon's vaginal bleeding was "uncontrollable" on the 14th and that the same level of blood loss was present at the time of surgery. **RR. Vol. 16A, 85:McCoy 0075 (Plaintiff's Exhibit 7)**.

The medical records showed (and Dr. Gunn agreed in her testimony) that the ultrasound performed at 5:25 a.m. showed retro-placental bleeding (bleeding behind the placenta), and that all the blood vessels in the uterus were completely filled with clotted blood. **RR. Vol. 10, 67:16-22, 120:11-19**. Dr. Gunn documented in her discharge summary that Shannon's uterus was "engorged" with blood "throughout the muscle layers[,]" and that the vaginal vault was "filled" with blood clots. **RR. 16A, 42-43:McCoy 0032-33 (Plaintiff's Exhibit 7)**. Dr. Gunn documented in her operative report from the hysterectomy surgery that Shannon had "obvious bleeding into the uterine musculature." **RR. 16A, 131:McCoy 0121 (Plaintiff's Exhibit 7)**. Dr. Gunn also documented in her operative report that "[t]he ICU bed had blood throughout from the head of the bed to the foot." **RR. 16A, 132:McCoy 0122 (Plaintiff's Exhibit 7)**. If Shannon wasn't really losing that much blood, and her bleeding was really improving, as Dr. Gunn claims in her letter brief, why was it necessary to give Shannon 3,400 mL of blood and blood products in the operating room? Dr. Brewer's testimony about Shannon's internal blood loss is supported by the reliable foundational data contained in Shannon's medical records. This letter brief point should be overruled.

**E.     The lab results do not negate Dr. Brewer's testimony about Shannon's blood loss.**

Dr. Gunn claims that Shannon's lab results negate Dr. Brewer's testimony that Shannon continued to bleed after delivery, but this point makes no sense in light of the documented facts contained in the medical records. Shannon's hemoglobin level on the first set of labs ordered by Dr. Jacobs was abnormally low at 8.6 (10.2-14.9 normal). **RR. Vol. 16B, 111:McCoy 0275 (Plaintiff's Exhibit 7)**. At 7:20 a.m. on the 14th, Shannon's hemoglobin level dropped from 8.6 to 5.5–a critically low level.[20] **RR. Vol. 16B, 111:McCoy 0275 (Plaintiff's Exhibit 7)**.

---

[20]     According to Shannon's lab records, a hemoglobin of 6.90 is a critically low level; accordingly, a 5.5 level and a 4.0 level are obviously critically low. **RR. Vol. 16B, 111:McCoy 00275 (Plaintiff's Exhibit 7)**. The lab results are highlighted and attached to this response along with Dr. Esper's documentation that Shannon's hemoglobin level was 4.0 before she was taken to surgery.

Importantly, while the lab results show that Shannon's hemoglobin level was 7.8[21] at 1:15 p.m., <u>Dr. Esper documented in her note that, according to a "stat" blood draw in the ICU, Shannon's hemoglobin level **had dropped to 4.0** at the time she was taken to the operating room at 2:10 p.m</u>. **RR. Vol. 16A, 88:McCoy 0078 (Plaintiff's Exhibit 7)** (emphasis added). The other lab values discussed by Dr. Brewer were equally consistent with her causation opinions concerning Shannon's blood loss. **RR. Vol. 16B, 109-10:McCoy 00273-74 (Plaintiff's Exhibit 7)**.

Specifically, Shannon's PT, FSP, and fibrinogen levels (indicators of Shannon's blood clotting ability) never normalized between the first lab results obtained at 10:15 p.m. on the 13th and the last labs that were drawn at 1:16 p.m. on the 14th before Shannon was taken to the operating room. **RR. Vol. 16B, 109-10:McCoy 00273-74 (Plaintiff's Exhibit 7)**. Shannon's PT level went up from 17.2 (10.8-13.5 normal) at 7:27 a.m. on the 14th to 18.2 at 1:16 p.m., indicating that Shannon's blood clotting mechanism was never corrected to normal before she was taken to the operating room. **RR. Vol. 16B, 109-10:McCoy 00273-74 (Plaintiff's Exhibit 7)**. Shannon's FSP and fibrinogen levels never improved and were always abnormal from 7:27 a.m. to 1:16 p.m., further indicating that Shannon's ability to clot never changed from abnormal to normal before she was taken to the operating room. **RR. Vol. 16B, 109-10:McCoy 00273-74 (Plaintiff's Exhibit 7)**. Shannon's clotting factors were so abnormal she was medically deprived of epidural anesthesia during delivery so that she would avoid the probable risk of becoming paralyzed. **RR. Vol. 8, 180:3-22**. Not only did Dr. Brewer discuss this fact with the jury, so did Dr. Gunn. **RR. Vol. 10, 69:6-16**. None of these lab values negate Dr. Brewer's opinions concerning Shannon's blood loss or causation. This letter brief point should be overruled.

---

[21] Dr. Gunn relies on this hemoglobin value to argue that Shannon's condition was "improving;" this argument ignores the fact that Shannon's hemoglobin level never normalized. The hemoglobin level of 7.8 is abnormally low and Dr. Brewer accounted for this rise in hemoglobin in her causation analysis by explaining to the jury that Shannon's hemoglobin level went up because of the packed red blood cells that were administered to her prior to 1:15 p.m.

**F.    Dr. Brewer's causation testimony was not based on *ipse dixit* assumptions.**

*Ipse dixit* means:  "I say it is so; therefore, so it is."   According to Dr. Gunn, Dr. Brewer expected the jury to accept her causation opinions as valid simply because she said they were.  Seriously, is that really what Dr. Brewer did? The totality of Dr. Brewer's causation analysis shows that this characterization is way off base, and that her testimony was legally sufficient to link-up Dr. Gunn's negligence to Shannon's brain damage.

Abraham Lincoln was once similarly accused of such high-handedness.  In response, this is what he had to say:

> I want to say that, in the first place, I have made no charge of any sort upon my *ipse dixit*.  I have only arrayed the evidence tending to prove it, and presented it to the understanding of others, saying what I think it proves, but giving you the means of judging whether it proves it or not.  This is precisely what I have done.  I have not placed it upon my *ipse dixit* at all.[22]

Dr. Brewer's testimony on causation was detailed and comprehensive, not *ipse dixit*. Dr. Gunn cites to the *Pollock* and *Wilson* opinions to assert her argument, but these decisions are unavailing.  A cursory comparison of the expert causation opinions in *Pollock* and those expressed by Dr. Brewer reveals that Dr. Brewer's causation analysis passes muster.  When it comes to *Wilson*, Dr. Brewer's causation testimony falls squarely  within the legal sufficiency requirements set forth in this case.   Dr. Gunn's letter brief point on this issue should be overruled.

---

[22] Abraham Lincoln, *Political Debates Between Lincoln and Douglas* 38-39 (Cleveland: Burrows Bros. Co. 1897).

**G.** **The summary judgment was properly granted because Appellants failed to introduce any evidence to establish a fact issue on nursing negligence.**

As Justice Boyce's comments at oral argument made clear, Appellants submitted no evidence in response to the McCoy family's motion for summary judgment to establish a fact issue on whether anything the nurses did, or failed to do, in this case proximately caused Shannon's brain damage. Dr. Gunn's letter briefing on this point should be overruled.

In closing, one final thought is worth mentioning here. If Dr. Gunn had devoted as much time to caring for Shannon on September 14, 2004 as she has in attempting to explain in her appellate briefing why the jury and Dr. Brewer got it wrong on the issue of proximate cause, imagine what would have happened to Shannon? The McCoy family respectfully requests that the points raised by Dr. Gunn in her letter briefing be overruled, and the trial court's judgment should be affirmed.

Very truly yours,

J. Todd Trombley

JTT:peb
Enclosures

cc: Mr. Jim Hund  *Via Facsimile No. (806) 783-8710 and eService*

Mr. Jeffery T. Nobles  *Via Facsimile No. (713) 960-1527 and eService*

Ms. Barbara Hilburn  *Via Facsimile No. (713) 224-5358 and eService*

Mr. Michael C. Feehan  *Via Facsimile No. (713) 652-6000 and eService*

# EXHIBIT 7

10/22/04
0620
MEDICAL DIRECTOR: Bradley Wertman, M.D.

The Woman's Hospital of Texas Laboratory
7800 Fannin, Houston, TX 77054

3

*** INPATIENT DISCHARGE SUMMARY REPORT ***

Patient: MCCOY, SHANNON          #F00019169487     (Continued)

*** COAGULATION *** (continued)

| Date | | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| Time | 2330 | 1810 | 1502 | 1316 | 0727 | 0727 | Reference | Units |
| FSP | >5<20 * | >5<20 * | >20(ab) * | >20 * | | >20(ac) * | (<5) | ug/mL |
| RVVT PATIENT | | | | | 1.4(ad) H | | (0.0-1.1) | RATIO |
| DVVTC | | | | | 0.9(ae) | | (0.8-1.2) | RATIO |
| STACLOT LA | | | | | 5.5(ad) | | (0.0-8.0) | RATIO |
| D-DIMER | 775(ag) H | 971(ah) H | | | | | (<248) | ng/ml |
| FAC V MUT | | | | | (ai) | | | |
| ANTITHROMBIN 3 | | | | | 61(ad) L | | (89-120) | % |
| PROTEIN C FUNC | | | | | 49(ad) L | | (60-140) | % |
| PROT C ANTIGENC | | | | | 63(ad) | | | |
| PROTEIN S TOTAL | | | | | 42(ad) L | | (70-140) | % |
| PROTEIN S FREE | | | | | 25(ad) L | | (58-113) | % |
| ACA IGG | | | | | 6.1(ad) | | (<=15) | GPL |
| ACA IGA | | | | | 1.5(ad) | | (<=12) | APL |
| ACA IGM | | | | | 6.6(ad) | | (<=12.5) | MPL |

| Date | SEP/14/04 | SEP/13/04 | | | | Reference | Units |
|------|-----------|-----------|---|---|---|-----------|-------|
| Time | 0020 | 2215 | | | | | |
| PT PATIENT | 20.0(ak) *H | 17.3(al) H | | | | (10.8-13.5) | SECONDS |
| PTT | 39.8(am) H | 35.7(an) H | | | | (23.7-34.2) | SECONDS |
| FIBRINOGEN | 193(ao) L | | | | | (351-773) | mg/dl |
| FSP | | >20 * | | | | (<5) | ug/mL |
| R-TIME | 7.3 | | | | | | |
| K-TIME | 7.9 | | | | | | |

NOTES:  (ab) RESULTS CALLED TO FELICIA AT 1539 09/14/04 BY F.LAB.IZD.
             EXT 3203
        (ac) ABOUT THE COAG PANEL
        (ad) TESTING PERFORMED AT SPRING BRANCH MEDICAL CENTER LABORATORY
             8850 LONG POINT ROAD, HOUSTON, TX 77055
        (ae) See (af), (ad)
        (af) This final result is expressed as the normalized ratio:
             Ratio greater than 2.0      LA is strongly present
             Ratio between 1.5 and 2.0   LA is moderately present
             Ratio between 1.2 and 1.5   LA is weakly present
        (ag) RESULTS CALLED TO WYNDE
             READ BACK & CONFIRMED? YES
             BY F.LAB.KAI 09/15/04 0431
             See also (ad)
        (ah) RESULTS CALLED TO ELEANOR READ BACK & CONFIRMED? Y
             BY F.LAB.ELH 09/14/04 2144
             See also (ad)
        (ai) NO MUTATION
             See also (aj), (ad)
        (aj) Testing performed at:  Spring Branch Medical Center
                                    8850 Longpoint
                                    Houston, TX 77055
        (ak) RESULTS VERIFIED BY REPEAT ANALYSIS
             RESULTS CALLED TO AMBER
             READ BACK & CONFIRMED? Y
             BY F.LAB.YMC 09/14/04 0118
        (al) RESULTS VERIFIED BY REPEAT ANALYSIS
        (am) RESULTS VERIFIED BY REPEAT ANALYSIS/
             RESULTS CALLED TO AMBER
             READ BACK & CONFIRMED? Y
             BY F.LAB.YMC 09/14/04 0118
        (an) RESULTS VERIFIED BY REPEAT ANALYSIS
        (ao) RESULTS VERIFIED BY REPEAT ANALYSIS

Patient: MCCOY, SHANNON          Age/Sex: 35/F      Acct#F00019169487    Unit#F000435351

Miles-McCoy  000273

10/22/04
0620
MEDICAL DIRECTOR: Bradley Wertman, M.D.

The Woman's Hospital of Texas Laboratory
7800 Fannin, Houston, TX 77054

2

*** INPATIENT DISCHARGE SUMMARY REPORT ***

**Patient: MCCOY,SHANNON**     #F00019169487     (Continued)

### *** HEMATOLOGY *** (continued)

| Date | SEP/14/04 | | | SEP/13/04 | Reference | Units |
|---|---|---|---|---|---|---|
| Time | 1316 | 0727 | 0017 | 2215 | | |
| MCHC | | 33.8 | | 31.7 L | (32-35) | gm/dL |
| RDW | | 19.5 H | | 18.5 H | (11.8-14.8) | % |
| PLT | 89 *L | 88 *L | 106(o) L | 150 | (135-380) | K/mm3 |
| MPV | | 7.8 | | 8.4 | (7.0-10.1) | fL |
| NEUT % | | | | 91.1 H | (51.5-79.7) | % |
| LYMPH % | | | | 4.0 L | (14-40) | % |
| MONO % | | | | 4.8 | (4.0-10.2) | % |
| EOS % | | | | 0.1 | (0-4.1) | % |
| BASO % | | | | 0.0 L | (0.1-0.7) | % |
| NEUT # | | | | 21.7 H | (2.5-8.6) | K/mm3 |
| LYMPH # | | | | 0.9 L | (1.1-3.6) | K/mm3 |
| MONO # | | | | 1.1 H | (0.3-0.9) | K/mm3 |
| EOS # | | | | 0.00 | (0.0-0.4) | # |
| BASO # | | | | 0.0 | (0.0-0.0) | K/mm3 |
| MAN DIFF NEEDED | | YES | | | | |
| RBC MORPH REV | | (p) | | (q) | (NORMAL) | |
| PLT MORPH REV | | (r) | | (s) | (NORMAL) | |
| CELLS COUNTED | | 100 | | | | #CELLS |
| SEGS | | 82 H | | | (55-80) | % |
| BAND | | 9 H | | | (0-5) | % |
| LYMPH | | 5 L | | | (20-40) | % |
| MONOCYTE | | 4 | | | (0-8) | % |
| HYPO | | 2+ | | | | |
| ANISO | | 1+ | | | | |
| MICRO | | 2+ | | | | |
| PLT ESTIMATE | | DECREASED * | | | (ADEQ) | |

### *** COAGULATION ***

| Date | | | | SEP/14/04 | | | Reference | Units |
|---|---|---|---|---|---|---|---|---|
| Time | 2330 | 1810 | 1502 | 1316 | 0727 | 0727 | | |
| PT PATIENT | 13.5 | 14.4 H | 19.7(t) *H | 18.2(u) *H | 17.2(v) H | 21.5(w) *H | (10.8-13.5) | SECONDS |
| PTT | 33.2 | 33.2 | 44.4(x) *H | 32.0 | 34.0(y) | 36.3 H | (23.7-34.2) | SECONDS |
| PT 1:3 MIX | | | | | 12.9(z) | | | SECS |
| FIBRINOGEN | 331 L | 214 L | 91 L | 151(aa) L | | 118 L | (351-773) | mg/dl |

NOTES: (o) RESULTS VERIFIED BY REPEAT ANALYSIS
     (p) RBC MORPH ABNORMAL
     (q) RBC MORPH ABNORMAL
        HYPOCHROMIA 1+
     (r) NORMAL PLT MORPH.
     (s) NORMAL PLT MORPH.
     (t) RESULTS CALLED TO FELICIA
        READ BACK & CONFIRMED? Y
        BY F.LAB.IZD 09/14/04 1539
     (u) RESULTS CALLED TO VICKY
        READ BACK & CONFIRMED? YES
        BY F.LAB.EDA 09/14/04 1422
     (v) INR=2.4
     (w) RESULTS VERIFIED BY REPEAT ANALYSIS
     (x) RESULTS CALLED TO FELICIA
        READ BACK & CONFIRMED? Y
        BY F.LAB.IZD 09/14/04 1539
     (y) TESTING PERFORMED AT SPRING BRANCH MEDICAL CENTER LABORATORY
        8850 LONG POINT ROAD, HOUSTON, TX 77055
     (z) PT MIX 1:1= 11.9
        See also (y)
    (aa) RESULTS CALLED TO SANDY AT 1446 09/14/04 BY F.LAB.EDA.

**Patient: MCCOY,SHANNON**     Age/Sex: 35/F     Acct#F00019169487     Unit#F000435351

Miles-McCoy 000274

10/22/04
0620
MEDICAL DIRECTOR: Bradley Wertman, M.D.

The Woman's Hospital of Texas Laboratory
7800 Fannin, Houston, TX 77054

1

*** INPATIENT DISCHARGE SUMMARY REPORT ***

PATIENT: MCCOY,SHANNON     ACCT #: F00019169487  LOC: F.ICU     U #: F000435351
                           AGE/SX: 35/F           ROOM: F.IC4    REG: 09/13/04
REG DR: Gunn,Debra Clark   STATUS: DIS IN         BED: A         DIS: 09/15/04

### *** HEMATOLOGY ***

| Date | --------SEP/15/04-------- | | ------------------------SEP/14/04---------------------- | | | | Reference | Units |
|------|------|------|------|------|------|------|------|------|
| Time | 1744 | 0530 | 2330 | 1810 | 1455 | 1316 | | |
| WBC | 18.7 H | 16.4 H | 12.4 H | 15.4 DH | 26.8 H | | (4.5-11.2) | K/mm3 |
| RBC | 3.64 | 3.71 | 3.70 | 4.14 D | 2.36 *L | | (3.42-5.20) | M/mm3 |
| HGB | 10.7 | 11.0 | 10.9 | 12.2(a) D | 6.9(b) L | 7.5 DL | (10.2-14.9) | gm/L |
| HCT | 31.9 | 32.2 | 32.5 | 35.9 D | 20.3 L | 22.3 DL | (31.3-44.8) | % |
| MCV | 88 | 87 | 88 | 87 | 86 | | (81-95) | fL |
| MCH | 29.4 | 29.5 | 29.6 | 29.6 | 29.1 | | (27-34) | pg |
| MCHC | 33.6 | 34.1 | 33.8 | 34.2 | 33.8 | | (32-35) | gm/dL |
| RDW | 15.1 H | 14.5 | 14.5 | 14.8 | 14.7 | | (11.8-14.8) | % |
| PLT | 75 *L | 75(c) *L | 74(d) *L | 81(e) *L | 61 *L | | (135-380) | K/mm3 |
| MPV | 9.8 | 8.9 | 8.8 | 8.4 | 8.1 | | (7.0-10.1) | fL |
| NEUT % | 92.5 H | 85.6 H | 80.9 H | 83.9 H | 79.5 | | (51.5-79.7) | % |
| LYMPH % | 3.6 L | 5.9 L | 9.6 L | 6.9 L | 15.5 | | (14-40) | % |
| MONO % | 3.7 L | 8.3 | 9.5 | 9.2 | 4.7 | | (4.0-10.2) | % |
| EOS % | 0.1 | 0.0 | 0.0 | 0.0 | 0.3 | | (0-4.1) | % |
| BASO % | 0.1 | 0.2 | 0.0 L | 0.0 L | 0.0 L | | (0.1-0.7) | % |
| NEUT # | 17.3 H | 14.0 H | 10.0 H | 12.9 H | 21.3 H | | (2.5-8.6) | K/mm3 |
| LYMPH # | 0.7 L | 1.0 L | 1.2 | 1.1 | 4.2 H | | (1.1-3.6) | K/mm3 |
| MONO # | 0.7 | 1.4 H | 1.2 H | 1.4 H | 1.2 H | | (0.3-0.9) | K/mm3 |
| EOS # | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | | (0.0-0.4) | # |
| BASO # | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | (0.0-0.0) | K/mm3 |
| RBC MORPH REV | (f) | (g) | | (h) | (i) | | (NORMAL) | |
| PLT MORPH REV | (j) | (k) | | (l) | (m) | | (NORMAL) | |

| Date | ----------------SEP/14/04---------------- | | | SEP/13/04 | | | Reference | Units |
|------|------|------|------|------|------|------|------|------|
| Time | 1316 | 0727 | 0017 | 2215 | | | | |
| WBC | | 29.7 H | | 23.8 H | | | (4.5-11.2) | K/mm3 |
| RBC | | 2.14 D*L | | 3.67 | | | (3.42-5.20) | M/mm3 |
| HGB | | 5.5(n) D*L | | 8.6 L | | | (10.2-14.9) | gm/L |
| HCT | | 16.3 D*L | | 27.2 L | | | (31.3-44.8) | % |
| MCV | | 76 L | | 74 L | | | (81-95) | fL |
| MCH | | 25.8 L | | 23.4 L | | | (27-34) | pg |

NOTES:  (a)  RESULTS CALLED TO KASSANDRA
             AT 1831 09/14/04 BY F.LAB.IZD.
        (b)  CRITICAL VALUE CALLED TO TROY RN AT 1457 ON 09/14/04
             BY F.LAB.EDA.
        (c)  RESULTS VERIFIED BY REPEAT ANALYSIS
             NOTIFICATION OF RESULTS BROADCAST TO ELENOIR BY F.LAB.TTT
             AT 0609. 09/15/04.
        (d)  NOTIFICATION OF RESULTS BROADCAST TO SELENA BY F.LAB.KAI
             AT 0210. 09/15/04.
        (e)  RESULTS CALLED TO KASSANDRA
             AT 1830 09/14/04 BY F.LAB.IZD.
        (f)  RBC MORPH NORMAL
        (g)  RBC MORPH NORMAL
        (h)  RBC MORPH NORMAL
        (i)  RBC MORPH NORMAL
        (j)  NORMAL PLT MORPH.
        (k)  NORMAL PLT MORPH.
        (l)  NORMAL PLT MORPH.
             SL. DECREASE
        (m)  NORMAL PLT MORPH.
        (n)  RESULTS CALLED TO MAGGIE
             READ BACK & CONFIRMED? YES
             BY F.LAB.EDA 09/14/04 0850
             RESULTS VERIFIED BY REPEAT ANALYSIS

Patient: MCCOY,SHANNON          Age/Sex: 35/F        Acct#F00019169487       Unit#F000435351

Miles-McCoy  000275

150 later on.  EKG was reviewed, no acute changes were noted, but there was diffuse nonspecific ST-T changes.

ASSESSMENT:
1.  Seizure activity. could be multifactorial, possibly eclampsia related, versus secondary to hypocalcemia versus secondary to anoxic seizure secondary to anoxic encephalopathy since the patient had cardiopulmonary resuscitation for ten minutes, and she was hypotensive prior to that, and her hemoglobin was 4 at the time of admission to the operating room for a dilatation and curettage and hysterectomy.
2.  Status post disseminated intravascular coagulation, secondary to fetal demise, secondary to placenta abruptio.
3.  Mild renal insufficiency, secondary mostly to hypovolemia.
4.  Hypocalcemia, secondary to Valium and blood products replacement.
5.  Hypertension, possibly preeclampsia related.
6.  Hyperglycemia, possibly related to intravenous fluid replacement with D5 half normal saline versus gestational diabetes.
7.  Elevated troponin level, most likely related to cardiopulmonary resuscitation rather than an myocardial infarction in the absence of signs of myocardial infarction on the electrocardiogram.

PLANS:
1.  The patient will be kept on magnesium loading and intravenous infusion, fosphenytoin loading dose and maintenance therapy, Versed or Ativan p.r.n.  Close monitoring of electrolytes with replacement will be done and also close monitoring of DIC profile.  Parameters of blood pressure will be given and possibly beta blockers or hydralazine will be started for a systolic blood pressure more than 170 or diastolic blood pressure more than 110. STAT neurology consult was ordered and requested for possible EEG and further management.
2.  The case was discussed in very great details with Dr. Gunn and Dr Shearer-Poor, they agreed with the above plan, also the family was informed about the condition and the progress, and all their questions were answered.  We spoke with, Dr. Shearer-Poor and I, with the husband, the brother, the sisters, and the father, and they all seemed to be understanding the situation. The patient's poor prognosis was also explained to them and unstable status at this time.

Chart Copy

Miles-McCoy  000078